## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|                                            |     |                            |
|--------------------------------------------|-----|----------------------------|
| **MARVIN PORTER,**                         | )   |                            |
|                                            | )   |                            |
| **Plaintiff,**                             | )   |                            |
|                                            | )   |                            |
| **vs.**                                    | )   | **Case No. 4:10CV 537 LMB** |
|                                            | )   |                            |
| **MICHAEL J. ASTRUE,**                     | )   |                            |
| **Commissioner of Social Security,**       | )   |                            |
|                                            | )   |                            |
| **Defendant.**                             | )   |                            |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Marvin Porter for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act.  This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff has filed a Brief in Support of the Complaint.  (Document Number 12).  Defendant has filed a Brief in Support of the Answer.  (Doc. No. 18).  Plaintiff has filed a Reply.  (Doc. No. 21).

## Procedural History

On March 13, 2007, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on November 15, 2005.  (Tr. 107-10, 111-13).  This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated August 4, 2009.  (Tr. 52-56, 33-41).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on January 29, 2010.  (Tr. 1-4).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

**A.**    **ALJ Hearing**

Plaintiff's administrative hearing was held on July 16, 2009.  (Tr. 7).  Plaintiff was present and was represented by counsel.  (Id.).

The ALJ examined plaintiff, who testified that he was thirty-seven years of age and was single.  (Tr. 9).  Plaintiff stated that he lived with his mother and that he had never lived on his own.  (Id.).

Plaintiff testified that he completed the "Transition Program," part of the special education program.  (Id.).  Plaintiff stated that he received a diploma.  (Id.).  Plaintiff testified that he took all special education classes in grade school and high school because he was a "slow learner." (Tr. 10).  Plaintiff stated that he has not received any formal training or vocational training other than the training he received in the special education program.  (Id.).

Plaintiff testified that he is able to read and write "a little bit."  (Id.).  Plaintiff stated that he did not know the grade level at which he read.  (Id.).  Plaintiff testified that he is able to perform basic mathematics such as addition and subtraction "a little bit."  (Id.).

Plaintiff stated that he was five-feet, nine-inches tall and weighed 220 pounds.  (Tr. 10-11).  Plaintiff testified that his weight fluctuates.  (Tr. 11).  Plaintiff stated that his weight ranges from 170 to 220 pounds.  (Id.).

Plaintiff testified that he was not working at the time of the hearing.  (Id.).

- 2 -

Plaintiff's attorney then examined plaintiff, who testified that he last worked in 2005. (Id.).  Plaintiff stated that he worked as a housekeeper and a beer porter at AmeriStar.  (Id.). Plaintiff testified that he performed both of these positions at the same time for about two years. (Tr. 12).  Plaintiff stated that this job ended because it became too stressful for him due to seizures he was experiencing.  (Id.).  Plaintiff testified that he had seizures while he was working. (Id.).  Plaintiff stated that at his position as a housekeeper/beer porter, he stood and walked his entire shift and lifted about twenty-five pounds frequently and fifty pounds occasionally.  (Id.).

Plaintiff testified that he worked at various linen departments for four to five years.  (Tr. 13).  Plaintiff stated that these positions required constant standing and walking.  (Id.).  Plaintiff testified that he only lifted about ten pounds at these positions.  (Id.).  Plaintiff stated that he also performed housekeeping work.  (Id.).

Plaintiff testified that he has not had any other positions since 1990.  (Id.).

Plaintiff stated that he was unable to work at the time of the hearing due to his seizure condition and the medications he takes.  (Id.).  Plaintiff testified that he takes medications for his seizures.  (Id.).  Plaintiff stated that he took Klonopin,[1] and another medication for his vertigo. (Id.).  Plaintiff testified that his medications cause him to experience difficulty with his memory. (Tr. 14).  Plaintiff stated that his doctor, Merrill E. Lucas, has advised him not to drive due to his seizure disorder.  (Id.).

Plaintiff testified that he last experienced a seizure the last year he worked.  (Id.).  Plaintiff stated that he does not recall having any seizures since he stopped working.  (Id.).  Plaintiff

---

[1]Klonopin is indicated for the treatment of seizure disorders.  See Physicians' Desk Reference (PDR), 2639 (63rd Ed. 2009).

testified that he still experiences problems, such as difficulty with his memory.  (Id.).

Plaintiff stated that his medication also causes him to sleep a lot.  (Id.).  Plaintiff testified that he

sleeps a lot during the day.  (Id.).  Plaintiff stated that he wakes up at about 9:00 a.m., watches

television for a while, and then goes back to sleep for the rest of the day.  (Tr. 15).  Plaintiff

testified that his medication is designed to help him relax.  (Id.).

Plaintiff stated that he has not noticed any triggers for his seizures.  (Id.).

Plaintiff testified that he experiences headaches every day.  (Id.).  Plaintiff stated that a

seizure usually comes on when he has a headache, although he has not been experiencing seizures

lately.  (Id.).  Plaintiff testified that he lies down for the rest of the day when he has a headache.

(Tr. 16).

Plaintiff stated that he experiences memory problems.  (Id.).  Plaintiff testified that he also

has difficulty focusing and concentrating.  (Id.).

Plaintiff stated that he is able to read somewhat.  (Id.).  Plaintiff testified that, when he

receives letters from the SSA or his attorney, his mother reads them to him.  (Id.).

Plaintiff stated that his mother drove him to the hearing.  (Id.).  Plaintiff testified that he

leaves the house once or twice a week to go shopping with his mother or to go to church.  (Id.).

Plaintiff stated that he never leaves the house alone.  (Id.).  Plaintiff testified that, when he leaves

the house, he is usually with his mother.  (Tr. 17).  Plaintiff stated that when he returns from

church or from a shopping trip, he is really tired.  (Id.).

Plaintiff testified that he vacuums occasionally.  (Id.).  Plaintiff stated that he is only able

to vacuum for a little while.  (Id.).  Plaintiff testified that he does laundry about once a week.

(Id.).  Plaintiff stated that he does not cook or do any other cleaning.  (Id.).

Plaintiff testified that he does not belong to any organizations or clubs.  (Id.).  Plaintiff

stated that he does not go out to visit friends or family.  (Id.).  Plaintiff testified that friends and

family visit him at his home about once a month.  (Id.).

Plaintiff stated that he had been seeing Dr. Lucas for a very long time.  (Tr. 18).  Plaintiff

testified that Dr. Lucas knows him well.  (Id.).

Plaintiff stated that his seizures started while he was in high school.  (Id.).  Plaintiff

testified that he was able to work with his seizures initially.  (Id.).  Plaintiff stated that Dr. Lucas

advised him to stop working when the number of seizures he experienced increased.  (Id.).

The ALJ then re-examined plaintiff, who testified that he stopped working at his last job as

a result of the seizures because the job was too stressful.  (Id.).  Plaintiff stated that his job was

stressful due to the amount of work that his employer expected him to do.  (Tr. 19).  Plaintiff

testified that he was taking medications when he was working.  (Id.).

Plaintiff stated that the type and dosage of his medications has remained consistent

throughout his treatment with Dr. Lucas.  (Id.).

## B.    Relevant Medical Records

The record reveals that plaintiff began receiving regular treatment for various complaints,

including seizure disorder and hepatitis C,[2] from Melvin Lucas, D.O., in September 1991.  (Tr. 207-

69, 345-54378-90).

On October 30, 1991, plaintiff presented to Janet Todorczuk, M.D. for evaluation of his

_____

[2]Hepatitis caused by an RNA virus that is classified with the Flaviviridae family.  The
incubation period is 6-8 weeks with about 75 percent of infections subclinical and giving rise to
chronic persistent infection.  A high percentage of these develop chronic liver disease leading to
cirrhosis and possible hepatocellular carcinoma.  Stedman's Medical Dictionary, 877 (28th Ed.
2006).

abnormal liver function tests.  (Tr. 326).  Dr. Todorczuk indicated that plaintiff had a seizure one year

prior and was treated with various medications but had been off all medications since January 1991,

due to side effects including rashes.  (Id.).  Upon examination, plaintiff had no signs of chronic liver

disease.  (Id.).

       Plaintiff was admitted to Christian Hospital on March 20, 1992, due to seizures.  (Tr. 329).

Dr. Todorczuk noted that plaintiff was being treated for chronic active autoimmune hepatitis,[3] which

seemed to be responding to Prednisone[4] and Imuran.[5]  (Tr. 330).  Dr. Todorczuk indicated that anti-

seizure medications would not be contraindicated by plaintiff's liver disease.  (Id.).

        Dr. Lucas prescribed Klonopin for plaintiff's seizure disorder in 1992.  (Tr. 263).

       In letters to Dr. Lucas dated May 15, 1992, and June 10, 1993, Dr. Todorczuk indicated that

she was treating plaintiff for autoimmune hepatitis, which was responding quite well to the current

treatment regimen.  (Tr. 312, 310).  Dr. Todorczuk stated that plaintiff's disease required long-term

follow-up and care.  (Id.).

       In a letter to Dr. Lucas dated November 10, 1993, James S. Bonner, M.D. stated that he had

seen plaintiff for follow-up of his seizure disorder on that date.  (Tr. 309).  Dr. Bonner indicated that

plaintiff continued to take Klonopin with no significant side effects.  (Id.).  Dr. Bonner stated that,

on exam, plaintiff was quiet and answered in only simple "yes" or "no" responses, which was not

---

[3]Chronic liver disease of unknown etiology and highly responsive to immunosuppressive therapy.  See Stedman's at 875.

[4]Prednisone is a corticosteroid indicated for the treatment of conditions such as arthritis, blood disorders, breathing problems, severe allergies, and immune system disorders.  See WebMD, http://www.webmd.com/drugs (last visited August 23, 2011).

[5]Imuran is an immunosuppressant drug indicated for the treatment of autoimmune diseases.  See WebMD, http://www.webmd.com/drugs (last visited August 23, 2011).

unusual for him.  (Id.).

Plaintiff saw Dr. Bonner on May 17, 1994, at which time he was taking Klonopin and reported no seizures. (Tr. 315).  Plaintiff had no complaints of side effects.  (Id.).  Plaintiff indicated that he was going to apply for disability.  (Id.).  Upon examination, plaintiff was somewhat quiet, slow, and only spoke with one-or-two-word phrases, which was baseline.  (Id.).  Dr. Bonner stated that plaintiff had a seizure disorder, which was well-controlled on Klonopin.  (Id.).  Dr. Bonner recommended that plaintiff consider the job market again.  (Id.).

On September 21, 2001, plaintiff saw Dr. Lucas for a follow-up after an emergency room visit on September 19, 2001.  (Tr. 261).  Plaintiff had experienced a seizure while working at Ameristar Casino and his employer took him to the hospital.  (Id.).  Dr. Lucas diagnosed plaintiff with seizure disorder.  (Id.).

On December 18, 2001, Dr. Lucas noted that plaintiff was taking Klonopin for his seizure disorder and that plaintiff's compliance with his medication was good.  (Tr. 260).  Plaintiff reported no new seizure activity on June 10, 2002, and August 15, 2002.  (Tr. 259).  On June 2, 2003, Dr. Lucas noted that plaintiff had a history of grand mal seizures but he had no problems at that time and reported no seizure activity.  (Tr. 255).

On October 6, 2003, plaintiff reported that he had experienced a seizure earlier that week and went to the emergency room.  (Tr. 251).  Dr. Lucas noted that this was plaintiff's first seizure since 2001.  (Id.).  Plaintiff also complained of right neck pain.  (Id.).  Dr. Lucas indicated that plaintiff was taking Klonopin.  (Id.).  Dr. Lucas noted no abnormalities on physical examination.  (Id.).  Dr. Lucas diagnosed plaintiff with seizure disorder, right neck pain, and muscle strain.  (Tr. 252).  He continued the Klonopin.  (Id.).  Plaintiff continued to complain of neck pain and swelling on October 9, 2003.

- 7 -

(Tr. 249).  Dr. Lucas ordered a CT scan of the cervical spine.  (Tr. 250).

On June 28, 2004, Dr. Lucas noted that plaintiff's seizures were stable on Klonopin.  (Tr. 234).  On August 16, 2004, October 25, 2004, December 20, 2004, June 13, 2005, October 3, 2005, October 19, 2005, November 14, 2005, July 10, 2006, November 15, 2006, January 15, 2007, and December 4, 2008, Dr. Lucas noted that plaintiff had no seizure activity and was taking his medication as directed.  (Tr. 231, 229,  227, 219, 217, 215, 213, 211, 209, 207, 345).

Plaintiff was admitted to DePaul Health Center on February 28, 2004, with complaints of abdominal pain.  (Tr. 294).  It was noted that plaintiff was an "extremely poor historian," and was unable to provide "any clear details."  (Id.).  Plaintiff was diagnosed with cholecystitis[6] and underwent a cholecystectomy[7] on March 25, 2004.  (Tr. 280).

Plaintiff complained of left lower quadrant pain in February 2005, and was diagnosed with diverticulitis.[8]  (Tr. 224-26).

On January 15, 2007, plaintiff reported experiencing an asthma attack.  (Tr. 207).

R. Cottone, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique on March 30, 2007.  (331-41).  Dr. Cottone indicated that plaintiff suffered from borderline intellectual functioning,[9] which did not precisely satisfy diagnostic criteria.  (Tr. 332).  Dr. Cottone expressed the opinion that plaintiff had mild limitations in his activities of daily living, and moderate

---

[6]Inflammation of the gallbladder.  Stedman's at 365.

[7]Surgical removal of the gallbladder.  Stedman's at 365.

[8]Inflammation of a diverticulum, especially of the small pockets in the wall of the colon, which fill with stagnant fecal material and become inflamed.  Stedman's at 575.

[9]Borderline intellectual functioning is defined by an IQ in the 71-84 range.  See Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 684 (4th Ed. 1994).

difficulties in maintaining concentration, persistence, or pace.  (Tr. 339).  Dr. Cottone noted that plaintiff underwent IQ testing at age eighteen, which revealed a verbal IQ score of 76, performance IQ score of 75, and full scale IQ score of 75, which was in the borderline range.  (Id.).  Dr. Cottone stated that plaintiff appears capable of performing at least simple, unskilled work.  (Tr. 341).

Dr. Cottone also completed a Mental Residual Functional Capacity Assessment.  (Tr. 342-44).  Dr. Cottone expressed the opinion that plaintiff was markedly limited in his ability to understand and remember detailed instructions and carry out detailed instructions; and moderately limited in his ability to maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, respond appropriately to changes in the work setting, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others.  (Tr. 342-43).  Dr. Cottone stated that plaintiff has demonstrated the capacity to perform simple one-and-two-step tasks on a sustained basis.  (Tr. 344).  Dr. Cottone noted that plaintiff has held long-term jobs in the past and is capable of performing self care, shopping, and cooking independently.  (Id.).  Dr. Cottone stated that plaintiff is capable of understanding, remembering, and carrying out and persisting at simple tasks; making simple work-related judgments; relating adequately to co-workers or supervisors; and adjusting adequately to ordinary changes in work routine or setting.  (Id.).

Dr. Lucas completed a Mental Medical Source Statement on March 16, 2009.  (Tr. 347-50).  Dr. Lucas indicated that plaintiff had a diagnosis of "seizure disorder."  (Tr. 350).  Dr. Lucas expressed the opinion that plaintiff had moderate limitations in his ability to cope with normal stress; function independently; behave in an emotionally stable manner; maintain reliability; adhere to basic standards of neatness and cleanliness; relate to family, peers, or caregivers; interact with strangers or

the general public; accept instructions or respond to criticism; make simple and rational decisions; maintain attention and concentration for extended periods; perform at a consistent pace without an unreasonable number and length of breaks; sustain an ordinary routine without special supervision; and respond to changes in work setting.  (Tr. 347-48).  Dr. Lucas found that plaintiff had no limitations in his ability to ask simple questions or request assistance; and maintain socially acceptable behavior.  (Tr. 348).  Dr. Lucas found that plaintiff was capable of understanding and carrying out simple one-or-two-step instructions and interacting appropriately with co-workers, supervisors, and the general public for four hours during a day.  (Tr. 349).  Dr. Lucas indicated that plaintiff would miss work three times a month or more due to psychologically-based symptoms.  (Id.).  Dr. Lucas stated that plaintiff's limitations as assessed have existed since 1990.  (Tr. 350).

On March 24, 2009, Dr. Lucas noted that plaintiff was taking his medication and that his last seizure occurred two years prior.  (Tr. 351).  Plaintiff complained of headaches, vertigo, and hot flashes.  (Id.).

C.    **Relevant School Records**

Records from the St. Louis County Special School District reveal plaintiff was initially diagnosed as "educable mentally retarded" in August 1978.  (Tr. 137).  A re-evaluation in August 1987 resulted in a diagnosis of mild/moderate mentally retarded.  (Id.).

The Wechsler Adult Intelligence Scale-Revised (WAIS-R) was administered on September 17, 1990, which revealed a verbal IQ of 76, performance IQ of 75, and full scale IQ of 75.  (Tr. 143). It was noted that these scores placed plaintiff in the borderline range of cognitive ability.  (Tr. 138). The results were felt to be a valid measure of plaintiff's cognitive level of functioning.  (Id.).  It was noted that plaintiff was very cooperative, pleasant, courteous and well-mannered.  (Id.).  Plaintiff

tended to work slowly but attempted to utilize his time effectively.  (Id.).  It was also noted that behaviorally, plaintiff demonstrated a good work attitude.  (Tr. 140).  On aptitude testing, plaintiff scored at a high second grade reading level, a high fourth grade math level, and a low fourth grade written language level.  (Tr. 121, 129, 139).

Special education services were terminated on May 29, 1992, when plaintiff and his mother agreed that plaintiff would graduate from the Industry Based Program upon his completion of the program's requirements.  (Tr. 124).

### The ALJ's Determination

The ALJ made the following findings:

1. The claimant met the insured status requirements of the Social Security Act on November 15, 2005, and he remained insured throughout the period of this decision.

2. The claimant has not engaged in substantial gainful activity since November 15, 2005 (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 et *seq.*).

3. The claimant has the following severe impairments: a seizure disorder and borderline intellectual functioning (20 CFR 404.1520(c) and 416.920(c).

4. The claimant's condition has not met or medically equaled a listing in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. Since November 15, 2005, the claimant has had the residual functional capacity to understand, remember and carry out simple instructions, respond appropriately to supervision and co-workers, and deal with changes in a routine work setting.  He has also been able to respond appropriately to usual work situations, provided the job does not impose stringent production quotas.  However, the work must not require exposure to unprotected heights or dangerous moving machinery.  The claimant has not had any exertional limitations.  This constitutes a wide range of unskilled work.

6. The claimant has been able to perform his past relevant work as a housekeeper since November 15, 2005 (20 CFR 404.1565 and 416.965).

7.      The claimant has not been disabled in accordance with the Social Security Act (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 38-40).

The ALJ's final decision reads as follows:

The claimant's applications for a period of disability, disability insurance benefits and supplemental security income, filed on March 13, 2007, are denied.  The claimant has not been disabled under sections 216(I), 223(d) or 1614(a)(3)(A) of the Social Security Act.

(Tr. 41).

**Discussion**

**A.      Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

B.     **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See

20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e).  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a,

- 14 -

416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).

If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff first argues that the ALJ erred in failing to include a narrative discussion of the rationale for the residual functional capacity finding and his specific findings are not supported by

- 15 -

medical evidence.  Plaintiff next argues that the ALJ failed to perform a proper analysis of the

opinions of plaintiff's treating physicians and failed to properly assign weight to these opinions.

Plaintiff also argues that the ALJ erred in evaluating the demands of plaintiff's past relevant work.

The undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's evaluation of the

medical opinion evidence.

Plaintiff contends that the ALJ erred in failing to assign substantial weight to the opinion

of treating physician Dr. Lucas and in failing to properly evaluate the opinion of state agency

psychologist Dr. Cottone.  In analyzing medical evidence, "[i]t is the ALJ's function to resolve

conflicts among 'the various treating and examining physicians.'"  Johnson v. Apfel, 240 F.3d

1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)).

"Ordinarily, a treating physician's opinion should be given substantial weight."  Rhodes v. Apfel,

40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir.

1995)).  Further, a treating physician's opinion will typically be given controlling weight when the

opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques

and is not inconsistent with the other substantial evidence in [the] record."  Prosch v. Apfel, 201

F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material

in original).  Such opinions, however, do "not automatically control, since the record must be

evaluated as a whole."  Id. at 1013 (quoting Bentley, 52 F.3d at 785-786).  Opinions of treating

physicians may be discounted or disregarded where other "medical assessments 'are supported by

better or more thorough medical evidence.'"  Id. (quoting Rogers v. Chater, 118 F.3d 600, 602

(8th Cir. 1997)).

Whatever weight the ALJ accords the treating physician's report, be it substantial or little,

- 16 -

the ALJ is required to give good reasons for the particular weight given the report.  See

Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001).  The ALJ, however, is not required

to discuss every piece of evidence submitted.  See Morrison v. Apfel, 146 F.3d 625, 628

(8th Cir. 1998).  If the opinion of a treating physician is not well supported or is inconsistent with

other evidence, the ALJ must consider: (1) the length of the treatment relationship and the

frequency of examination, (2) the nature and extent of the treatment relationship, including the

treatment provided and the kind of examination or testing performed, (3) the degree to which the

physician's opinion is supported by the relevant evidence, (4) consistency between the opinion

and the record as a whole, (5) whether or not the physician is a specialist in the area upon which

an opinion is rendered, and (6) other factors which may contradict or support the opinion.  See

Rhodes, 40 F. Supp.2d at 1119; 20 C.F.R. § 404.1527 (d)(2)-(6).

Dr. Lucas completed a Mental Medical Source Statement on March 16, 2009.  (Tr. 347-

50).  The limitations assessed by Dr. Lucas were based on plaintiff's diagnosed "mental

impairment" of "seizure disorder."  (Tr. 350).  Dr. Lucas expressed the opinion that plaintiff had

moderate limitations in his ability to cope with normal stress; function independently; behave in an

emotionally stable manner; maintain reliability; adhere to basic standards of neatness and

cleanliness; relate to family, peers, or care-givers; interact with strangers or the general public;

accept instructions or respond to criticism; make simple and rational decisions; maintain attention

and concentration for extended periods; perform at a consistent pace without an unreasonable

number and length of breaks; sustain an ordinary routine without special supervision; and respond

to changes in work setting.  (Tr. 347-48).  Dr. Lucas found that plaintiff had no limitations in his

ability to ask simple questions or request assistance; and maintain socially acceptable behavior.

- 17 -

(Tr. 348).  Dr. Lucas indicated that plaintiff would miss work three times a month or more due to psychologically-based symptoms.  (Id.).  Dr. Lucas stated that plaintiff's limitations as assessed have existed since 1990.  (Tr. 350).

The ALJ discussed Dr. Lucas' opinion and indicated that he was giving "little weight" to the opinion.  (Tr. 39).  The ALJ first stated that Dr. Lucas' opinion is not supported by Dr. Lucas' own treatment notes.  (Id.).  The ALJ pointed out that psychiatric exams performed by Dr. Lucas regularly demonstrated normal results.  (Id.).  The ALJ next stated that it is doubtful that a seizure disorder would impair social functioning to the extent he stated.  (Id.).  The ALJ also found that Dr. Lucas' opinion is refuted by the record, which reveals that plaintiff has had a seizure disorder since adolescence yet was able to sustain full-time work from 1992 to 2005.  (Id.).

The ALJ further found that, even if Dr. Lucas' intent were to give opinions on plaintiff's borderline intellectual functioning, Dr. Lucas' opinion is inconsistent with the record as a whole.  (Id.).  The ALJ noted that school records reveal that, although plaintiff required special education, he had good work aptitudes and behavior, completed the requirements for a community and industry-based program, attained a full scale IQ score of 75, and had age-appropriate adaptive behavior.  (Tr. 40).  The ALJ also pointed out that state agency psychologist Dr. Cottone concluded that plaintiff could sustain simple tasks.  (Id.).

The ALJ erred in evaluating the medical opinion evidence.  Dr. Lucas had been plaintiff's treating physician for approximately eighteen years at the time he rendered his opinion.  Plaintiff saw Dr. Lucas on a regular basis for treatment of his seizure disorder, in addition to other complaints.  The ALJ found that Dr. Lucas' opinion was not supported by his treatment notes and

- 18 -

pointed out that psychiatric exams performed by Dr. Lucas were normal. (Tr. 39). While it is true that no psychiatric abnormalities were noted, Dr. Lucas simply checked boxes on a form indicating that plaintiff was oriented times three, and had a normal mood and affect. (Tr. 208, 214, 220, 228, 232, 246, 250, 254, 352, 381, 387). These basic psychiatric exam findings are not inconsistent with Dr. Lucas' opinion.

Dr. Lucas' opinion raises many questions. First, as the ALJ pointed out, Dr. Lucas indicated that the limitations assessed were based on plaintiff's diagnosed "mental impairment" of "seizure disorder." (Tr. 350). It is unclear whether Dr. Lucas believed that plaintiff's seizure disorder itself resulted in the mental limitations assessed, plaintiff's seizure medications resulted in the assessed limitations, or, as the ALJ suggests, Dr. Lucas intended to express an opinion regarding plaintiff's borderline intellectual functioning. Second, Dr. Lucas' treatment notes are somewhat cursory and provide no insight as to the severity of plaintiff's mental impairments. Dr. Lucas' records reveal that plaintiff's seizure disorder was well-controlled with medication. In fact, plaintiff went multiple years without experiencing any seizures. The fact that plaintiff's seizure disorder was well-controlled, however, reveals nothing about plaintiff's cognitive abilities. Further, although Dr. Lucas indicated that the limitations as assessed have existed since 1990, plaintiff was able to work until 2005. (Tr. 350). Plaintiff acknowledges this inconsistency and suggests that Dr. Lucas mistakenly provided the date of onset of plaintiff's seizure disorder rather than providing the date upon which the assessed mental limitations began.

The ALJ and both parties provide much speculation regarding Dr. Lucas' intent in light of the ambiguities present in his opinion. Under these circumstances, the ALJ should have contacted Dr. Lucas, who had treated plaintiff for eighteen years when he rendered his opinion, for

"additional evidence or clarification."  20 C.F.R. § 404.1512(e); Bowman v. Barnhart, 310 F.3d 1080, 1085 (8th Cir. 2002).  In Bowman, the Eighth Circuit Court of Appeals stated that the ALJ was obligated to contact plaintiff's long-time treating physician for additional evidence or clarification when the doctor's "somewhat cursory" entries and opinion letter did not adequately assess how plaintiff's impairments limited her work-related activities.  310 F.3d at 1084-85.  An ALJ has the duty to ask plaintiff's doctors to comment on his ability to function in the workplace, as the ALJ "may not draw upon his own inferences from medical reports" in assessing plaintiff's RFC.  Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

Plaintiff also argues that the ALJ failed to properly evaluate the opinion of state agency psychologist Dr. Cottone.  Dr. Cottone completed a Psychiatric Review Technique on March 30, 2007, based on a review of plaintiff's records.  (Tr. 331-41).  Dr. Cottone indicated that plaintiff suffered from borderline intellectual functioning, which did not precisely satisfy diagnostic criteria. (Tr. 332).  Dr. Cottone expressed the opinion that plaintiff had mild limitations in his activities of daily living, and moderate difficulties in maintaining concentration, persistence, or pace.  (Tr. 339).  Dr. Cottone stated that plaintiff appeared capable of performing at least simple, unskilled work.  (Tr. 341).  Dr. Cottone also completed a Mental Residual Functional Capacity Assessment, indicating that plaintiff was markedly limited in his ability to understand and remember detailed instructions and carry out detailed instructions; and moderately limited in his ability to maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, respond appropriately to changes in the work setting, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others.  (Tr. 342-43).  Dr. Cottone stated that plaintiff has demonstrated the capacity to

perform simple one-and-two-step tasks on a sustained basis. (Tr. 344). Dr. Cottone stated that

plaintiff is capable of understanding, remembering, and carrying out and persisting at simple tasks;

making simple work-related judgments; relating adequately to co-workers or supervisors; and

adjusting adequately to ordinary changes in work routine or setting. (Id.). Dr. Cottone noted

that plaintiff alleges slow mentation at times, which "may or may not be related to seizure

activity." (Id.).

   The ALJ referred to Dr. Cottone's opinion as follows: "Additionally, R. Cottone, Ph.D., a

State-agency psychologist who reviewed the record in March 2007, concluded that the claimant

could sustain simple tasks." (Tr. 40). The ALJ did not indicate the weight he was assigning to

Dr. Cottone's opinion nor did he discuss Dr. Cottone's other findings.

   "Unless a treating source's opinion is given controlling weight, the administrative law

judge must explain in the decision the weight given to the opinions of a State agency medical or

psychological consultant." 20 C.F.R. § 404.1527(f)(2)(ii). "The opinions of nonexamining

sources are generally, but not always, given less weight than those of examining sources."

Wilcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(1)).

Rather, "because nonexamining sources have no examining or treating relationship with [the

claimant], the weight [the Commissioner] will give their opinions will depend on the degree to

which they provide supporting explanations for their opinions." 20 C.F.R. §§ 404,1527(d)(3),

416.927(d)(3). "The opinions of non-treating practitioners who have attempted to evaluate the

claimant without examination do not normally constitute substantial evidence on the record as a

whole." Shontos v. Barnhart, 328 F.3d 418, 425-26 (8th Cir. 2003).

   In this case, the ALJ erred by not explaining the weight he gave to the opinion of the state

agency psychologist, Dr. Cottone.  Where, as here, an ALJ does not give controlling weight to

the opinion of a treating source such as Dr. Lucas, the Commissioner's regulations require the

ALJ to explain the weight given to the consultant.  See 20 C.F.R. § 404.1527(f)(2)(ii).  It appears

that the ALJ relied, at least in part, on Dr. Cottone's opinion, as he incorporated many of the

limitations found by Dr. Cottone in his residual functional capacity determination.

The ALJ made the following determination regarding plaintiff's residual functional

capacity:

> Since November 15, 2005, the claimant has had the residual functional capacity to
> understand, remember and carry out simple instructions, respond appropriately to
> supervision and co-workers, and deal with changes in a routine work setting.  He has also
> been able to respond appropriately to usual work situations, provided the job does not
> impose stringent production quotas.  However, the work must not require exposure to
> unprotected heights or dangerous moving machinery.  The claimant has not had any
> exertional limitations.  This constitutes a wide range of unskilled work.

(Tr. 38-39).

Determination of residual functional capacity is a medical question and at least "some

medical evidence 'must support the determination of the claimant's [residual functional capacity]

and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the

workplace.'"  Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel,

245 F.3d 700, 704 (8th Cir. 2001)).  Further, determination of residual functional capacity is

"based on all the evidence in the record, including 'the medical records, observations of treating

physicians and others, and an individual's own description of his limitations.'"  Krogmeier v.

Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863

(8th Cir. 2000)).  Similarly, in making a finding of residual functional capacity, an ALJ may

consider non-medical evidence, although the residual functional capacity finding must be

supported by *some* medical evidence.  See Lauer, 245 F.3d at 704.

The undersigned finds that the ALJ's residual functional capacity determination is not supported by substantial evidence.  The ALJ did not provide a rationale for his residual functional capacity nor did he cite any medical opinions supporting his determination.  As previously discussed, the ALJ improperly assigned little weight to the opinion of plaintiff's treating physician, Dr. Lucas.  There is no opinion from any other examining physician, treating or consulting, regarding plaintiff's ability to function in the workplace with his seizure disorder and borderline intellectual functioning.  Although the ALJ found that plaintiff's borderline intellectual functioning is a severe impairment, plaintiff was not examined by a psychologist or psychiatrist since his alleged onset date, and the last time plaintiff underwent intellectual testing was in 1990.

As discussed above, the ALJ did not indicate the weight he was assigning to the opinion of the nonexamining state agency psychologist, Dr. Cottone.  Notably, Dr. Cottone's opinion was based upon a review of the record in 2007, two years prior to Dr. Lucas' opinion.  To the extent the ALJ relied on Dr. Cottone's opinion, the ALJ's decision is not supported by substantial evidence.  See Shontos, 328 F.3d at 425-26.

An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace.  See Hutsell, 259 F.3d at 711-712; Nevland , 204 F.3d at 858.  Here, the ALJ's residual functional capacity assessment fails Lauer's test that the residual functional capacity be supported by *some* medical evidence.  See Lauer, 245 F.3d at 703.

After determining plaintiff's residual functional capacity, the ALJ then found that plaintiff retained the ability to perform his past relevant work as a housekeeper.  (Tr. 40).  The undersigned has found that the residual functional capacity formulated by the ALJ was not

- 23 -

supported by substantial evidence.  As such, the ALJ's step four determination was similarly  not supported by substantial evidence

## Conclusion

In sum, the decision of the ALJ finding plaintiff not disabled is not supported by substantial evidence.  The ALJ failed to properly weigh the medical opinions and failed to develop the record by not obtaining necessary medical evidence addressing plaintiff's ability to function in the workplace.  The ALJ's assessment of plaintiff's residual functional capacity was not based on substantial medical evidence in the record thereby producing an erroneous residual functional capacity.  For these reasons, this cause will be reversed and remanded to the ALJ for further proceedings consistent with this Memorandum.  Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this  8th  day of September, 2011.

_Lewis M. Blanton_

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE